AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
a forensic extraction (copy) of a black Dell Laptop Latitude 3580 Serial Number 3Q6ZMJ2 (E4401) to include the hard drive (E4402) seized on September 25, 2019 ("Target Device 3")

)
)
)
)
)
)

Case No. **21-MJ-1060**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3, incorporated herein by reference.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC §§ 841(a)(1), 846, 843(b); 18 USC §§ 1956-1957, 1959, 1962 (c), 1963. 922(g)(1), 1028, 1029, 1343, 371 and 1028A | Unlawful use of a communication facility to facilitate the commission of drug offenses; Conspiracy to launder monetary instruments and money laundering; Violent crimes in aid of racketeering activity; Racketeering and racketeering conspiracy (RICO); Felon in possession of a firearm; Fraud and related activity in connection with identification documents; Access device fraud; Wire fraud; Conspiracy; and aggravated identity theft |

The application is based on these facts:

See Attached Affidavit of FBI Special Agent Peter Pisciotta, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Peter Pisciotta, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: _____ 03/18/2021 _____

_____
*Judge's signature*

City and state: San Diego, California

Hon. Linda Lopez, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-3

## PROPERT TO BE SEARCHED

The following property is to be searched:

a forensic extraction (copy) of a black Dell Laptop Latitude 3580 Serial Number 3Q6ZMJ2 (E4401) to include the hard drive (E4402) seized on September 25, 2019 ("**Target Device 3**")

Target Device 3 is currently in the possession of the San Diego County District Attorney's Office Computer and Technology Crimes High Tech Task Force (CATCH), 330 West Broadway, San Diego, CA 92101.

## ATTACHMENT B

## ITEMS TO BE SEIZED

The evidence to be seized from the Target Device will be electronic records, communications, records, electronic documents, or data including but not limited to emails, text messages, chats and chat logs from any applications, voice messages, photographs, images, audio files, videos, or location data for the period of **July 11, 2019, through September 26, 2019**:

a. involving, relating to, or memorializing the distribution of controlled substances (especially methamphetamine and heroin); aggravated identity theft; credit cards, debit cards, or other access devices, or any account information associated with such devices or identification information; monetary instruments; real, forged and/or falsified personal identification documents; buyer lists, money remitters, transmitters, and/or transfer services, records of sales, seller lists, log books, drug ledgers, computer software, canceled checks, tax returns; obtaining real or false identification in any form, including birth certificates, driver's licenses, immigration cards, and other forms of identification in which the same person would use other names and identities other than his or her own; financial and bank records;

b. involving, relating to, or memorializing disposition of proceeds from the distribution of controlled substances, access device fraud, identity theft, or check fraud; collection or payment of Aryan Brotherhood and/or Lakeside Gangster tax/extortion money; any conspiracy to conduct racketeering enterprise affairs (fraud, drug trafficking, assaults, and robbery);

c. tending to identify any co-conspirators, criminal associates, or others involved in a scheme to: steal personally identifying information or account information, forge and/or falsify identification documents, create counterfeit access devices or monetary instruments, purchase money orders, distribute controlled substances, tax or otherwise extort for the benefit of Aryan Brotherhood or any subordinate white supremacist gangs, conspiracy to conduct racketeering enterprise affairs (fraud, drug trafficking, assaults, and robbery), and/or to launder the proceeds of any of the above;

d. tending to identify travel to or presence at locations involved in the commission of activities described above;

e.      tending to identify the user of, or persons with control over or access to, the Target Device, or tending to authenticate or identify any person associated with any of the records identified in any of the preceding paragraphs;

f.      tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

g.      tending to identify other accounts, facilities, storage devices, communication applications and/or services—such as email addresses, IP addresses, phone numbers, or evidence of paired devices—that may contain electronic evidence described in any of the preceding paragraphs;

which constitute evidence of possession of a controlled substance with intent to distribute and conspiracy to do same, in violation of  21 USC §§ 841(a)(1) and 846; unlawful use of a communication facility to facilitate the commission of drug offenses, in violation of  21 USC § 843(b); conspiracy to launder monetary instruments and money laundering, in violation of 18 USC §§ 1956-1957; violent crimes in aid of racketeering activity, in violation of Title 18, United States Code Section 1959; racketeering and racketeering conspiracy (Racketeer Influenced and Corrupt Organizations in violation of 18 U.S.C. § 1962(c) and (d), punishable under 18 U.S.C. § 1963, by conducting the affairs of an enterprise, that is, a group of individuals associated in fact, although not a legal entity, to wit, the Subjects and others, the activities of which affected interstate and foreign commerce, through a pattern of racketeering activity consisting of acts involving murder and offenses involving the distribution of controlled substances in violation of 21 USC §§ 841(a)(1) and 846; felon in possession of a firearm, in violation of Title 18, United States Code Section 922(g)(1); fraud and related activity in connection with identification documents, in violation of Title 18, United States Code Sections 1028; access device fraud, in violation of 18 USC § 1029; wire fraud, in violation of 18 USC § 1343; conspiracy, in violation of 18 USC § 371; and aggravated identity theft, in violation of Title 18, United States Code Section 1028A ("the Target Offenses").

Authorization to search the Target Device described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Target Device for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

## AFFIDAVIT

I, Special Agent Peter Pisciotta, being duly sworn, hereby state as follows:

## INTRODUCTION

1.     I submit this affidavit in support of an application for a warrant to search the following electronic device(s):

a.     Apple iPad in a black case Model A1709 Serial Number DMPWG1N5HPDW ("**Target Device 1**")

b.     a forensic extraction (copy) of a black Samsung Tablet Model SM1597V and Serial Number SMT597VZKA (E4410) to include the Micro SD Card (E4411) seized on September 25, 2019 ("**Target Device 2**")

c.     a forensic extraction (copy) of a black Dell Laptop Latitude 3580 Serial Number 3Q6ZMJ2 (E4401) to include the hard drive (E4402) seized on September 25, 2019 ("**Target Device 3**")

d.     a forensic extraction (copy) of a Red/Black HP Laptop Model 15BS144WM and Serial# CND90502VP (E4403) to include the hard drive (E4404) seized on September 25, 2019 ("**Target Device 4**")

e.     a forensic extraction (copy) of a Grey/Black HP Laptop Model AR5B195 and Serial Number BCAF7100A5C3F0E (E4405) to include the hard drive (E4406) seized on September 25, 2019 ("**Target Device 5**")

f.     black/grey Coolpad cell phone with a broken screen ("**Target Device 6**")

(collectively referred to as the "**Target Devices**")

as further described in Attachment A-1 through A-6, and to seize evidence of crimes, specifically possession of a controlled substance with intent to distribute and conspiracy to do same, in violation of   21 USC §§ 841(a)(1) and 846; unlawful use of a communication facility to facilitate the commission of drug offenses, in violation of  21 USC § 843(b); conspiracy to launder monetary instruments and money laundering, in violation of 18 USC §§ 1956-1957; violent crimes in aid of racketeering activity, in violation of Title 18, United States Code Section 1959; racketeering and racketeering conspiracy (Racketeer Influenced and Corrupt Organizations in violation of 18 U.S.C. § 1962(c) and (d), punishable under 18 U.S.C. § 1963, by conducting the affairs of an enterprise, that is, a group of individuals associated in fact, although not a legal entity, to wit, the Subjects and others, the activities of which affected interstate and foreign commerce, through a pattern of racketeering activity consisting of acts involving murder and offenses involving the distribution of controlled substances in violation of 21 USC §§ 841(a)(1) and 846; felon in possession of a firearm, in violation of Title 18, United States Code Section 922(g)(1); fraud and related activity in connection with identification documents, in violation of Title 18, United States Code Sections 1028; access device fraud, in violation of 18 USC § 1029; wire fraud, in violation of 18 USC § 1343; conspiracy, in violation of 18 USC § 371; and aggravated identity theft, in violation of Title 18, United States Code Section 1028A (collectively the "Target Offenses"), as further described in Attachment B. The **Target Devices** were seized on September 25, 2019, pursuant to a search warrant issued by the Superior Court of California, County of San Diego, from the vicinity of Sure Way Inn at 1355 E. Main Street, El Cajon pursuant to a search warrant issued by the Superior Court of California, East County Superior Court House, for Room 321 at the Sure Way Inn 1355 E. Main Street El Cajon, California. The search warrant was executed by investigators of the San Diego County Sheriff's Department. The **Target Devices** are currently in custody of the San Diego County District Attorney's Office.

2.     The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the Target Devices, it does not contain all the information known by me or other agents regarding this investigation.  All dates and times described are approximate.

## **BACKGROUND**

3.     I am a Special Agent and currently employed by the Federal Bureau of Investigation (FBI) since January 2017. As part of my training, I attended the FBI Academy at Quantico, Virginia. During this time, I received formalized training in various investigative techniques required of every Special Agent candidate before becoming a Special Agent with the FBI. Following my successful completion of the FBI Academy, I was assigned to the FBI's San Diego Field Office. I have been assigned to the San Diego Violent Crimes Task Force (VCTF). During this time, I have investigated drug trafficking, gang and organized criminal activity, and drug-related violence in San Diego, California, and surrounding areas.

4.     Prior to my joining the Federal Bureau of Investigations, I was a Naval Search and Rescue Air-Crewman. My experience in the United States Navy required the ability to adapt to fluid situations and changing environments as well as plan, brief, and execute missions under less than favorable circumstances. My experience as an FBI agent has included, undercover narcotics purchases, use of Confidential Human Sources, search warrants, arrest warrants, subject interviews, subject interrogations, Title III wiretaps, and various other criminal law enforcement procedures. The result of my experiences and conversations with other Special Agents, Task Force Officers (TFO's), and other local law enforcement officers familiar with street gangs and their various criminal activities form the basis of opinions and conclusions set forth below, which I drew from the facts set forth herein. Dates and times outlined in this affidavit are approximate.

5.      During my employment, I have become familiar with the ordinary meaning of controlled substance slang and jargon, and I am familiar with the manners and techniques of drug traffickers and individuals involved in fraud as practiced locally. Furthermore, I have frequently discussed with other law enforcement officials, informants, and cooperating defendants the way drug traffickers and identity thieves operate, including the use of residences, businesses, cellular telephones, computers, storage devices, and vehicles, as well as the types of evidence commonly stored in those places. I have also worked with an undercover agent, and in that capacity have discussed how they negotiated for and purchased controlled substances, as well as how they have obtained evidence and information concerning fraud and drug trafficking and the inner workings of organizations that commit those offenses. I have often acted as a surveillance agent and have observed and recorded the movements of suspected drug traffickers and individuals involved in identity theft on numerous occasions.

6.      Based on my training and experience, I am familiar with how drug traffickers, gang members, and individuals involved in identity theft communicate and operate. For example, I am aware that they frequently discuss criminal activity using computers, cellular telephones, and social media.  In those mediums, they often use coded language to obscure or minimize these conversations. I also know that they change phones to evade detection by law enforcement. Moreover, I know that they obtain phones from third parties and/or subscribe to social media accounts, sometimes using fictitious names, to mask the true identity of the individuals using the phones or social media accounts. I am familiar with the typical make up and operation of gangs and drug trafficking organizations, including the distribution, storage, and transportation of the drugs, as well as the collection of money, which represents the proceeds of drug trafficking and other criminal activity, and often entails money laundering and/or identity theft.  I am also familiar with how individuals involved in identity theft steal personal identifying information and utilize computers and hard

drives to forge monetary instruments and identification documents for their own monetary gain.

7.      Based upon my training, experience, and consultations with law enforcement officers experienced in areas of gangs, firearms trafficking, and/or drug trafficking investigations, identity theft, fraud, aggravated identity theft, fraud and related activity in connection with identification documents, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s))  can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. I am also aware that computers (including hard drives and SD Cards) and iPads or tablets can and often do contain electronic evidence, including, for example, logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the computer/iPad/tablet. Specifically, searches of cellular telephones, computers, iPads, and tablets of individuals involved in gangs, firearms trafficking, and/or drug trafficking investigations, identity theft, fraud, aggravated identity theft, fraud and related activity in connection with identification documents and may yield the following evidence:

a.      Individuals involved in identity theft, identification card fraud, and check card fraud will frequently use computers or tablets to assist in the manufacture of fraudulent credit cards, fraudulent identity cards, and fraudulent checks.   These individuals will use computers to allow them to encode the personal identifying information of others onto fraudulent credit cards, use digital templates to create

fraudulent credit cards and fraudulent identification cards, and will store files containing the personally identifying information (PII) for future use;

b.      Individuals involved in identity theft, access device fraud, and identification card fraud can use computers, tablets, and phones to allow them to purchase the materials to manufacture fraudulent credit cards or identification cards;

c.      Individuals involved in identity theft, access device fraud, and identification card fraud will use computers, tablets, and cellular phones to research their victims and keep track of any information that they find;

d.      Individuals involved in identity theft, access device fraud, and identification card fraud will use computers to attempt to use fraudulent credit cards to make purchases online;

g.      Individuals involved in check fraud may use computers, tablets, and cellular phones to try to deposit the fraudulent checks into bank accounts;

h.      Individuals involved in identity theft, access device fraud, and identification card fraud can collect personal identifying information from unsuspecting individuals and then resell that information online for others to use;

i.      Individuals involved in identity theft, access device fraud, identification card fraud, and check card fraud may use external hard drives to store illicitly obtained information because they are easier to conceal from law enforcement, provide additional storage for their illicit files, and permit them to easily transfer information from one device to another;

j.      Individuals involved in drug/money trafficking, racketeering and corrupt organizations, and violent crimes will use cellular telephones because they are mobile and give them near instant access to emails, text messages, photographs, images, audio files, videos, call logs (including incoming/outgoing/missed calls and their duration), address book entries, IP addresses, social network data, internet searches, websites viewed, application-based communication history, GPS navigation and/or location data;

k.      Individuals involved in drug/money trafficking, racketeering and corrupt organizations, and violent crimes and their accomplices will use cellular telephones to coordinate meetings and other logistics, contact their buyers and suppliers, negotiate the purchase or sale of their illegal merchandise, and/or communicate regarding collection and payment of taxes/extortion money;

l.      Individuals involved in drug/money trafficking, racketeering and corrupt organizations, and violent crimes will use cellular telephones to direct buyers or suppliers to synchronize an exact drop-off and/or pick-up time of their illegal contraband;

m.      Individuals involved in drug/money trafficking, racketeering and corrupt organizations, and violent crimes will use cellular telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings;

n.      It is very common for individuals involved in drug/money trafficking, racketeering and corrupt organizations, and violent crimes to use cellular telephones, computers, tablets, and personal digital assistants with internet access, storage, or photograph and video capabilities to take, store, post on social media, or on cloud storage applications photographs, videos, and other media depicting their criminal activity;

o.      It is common for individuals involved in drug/money trafficking, racketeering and corrupt organizations, and violent crimes to keep telephone numbers, text or audio conversations, and contact information for their drug suppliers and/or and co-conspirators on cellular telephones, computers, tablets, and personal digital assistants; and

p.      The use of cellular telephones by individuals involved in drug/money trafficking, racketeering and corrupt organizations, and violent crimes tend to generate evidence that is stored on the cellular telephones, including, but not limited to emails,

7

text messages, photographs, images, audio files, videos, call logs (including incoming/outgoing/missed calls and their duration), contacts/address book entries, IP addresses, social network data, internet searches, websites viewed, application-based communication history, GPS navigation and/or location data, and deleted data/files.

q.     Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists, and stored text messages. Much of the evidence generated by persons involved in drug/money trafficking, racketeering and corrupt organizations, and violent crimes would likely be stored on any SIM Card that has been utilized in connection with that cellular telephone.

r.     Individuals involved in drug/money trafficking, racketeering, and violent crimes are aware that the use of their computers, tablets, and cellular phones in furtherance of their criminal activities creates several types of electronic or cloud-based evidence. (This evidence may include but is not limited to emails, incoming and outgoing text messages, photographs, images, audio files, videos, call logs (including incoming/outgoing/missed calls and their duration), contacts/address book entries, IP addresses, social network data, web-based messaging, GPS navigation, and/or location data. As a result, traffickers who anticipate that their cellular phones, computers, or tablets will be searched by law enforcement often attempt to delete some or all existing data on their cellular phones in order to destroy evidence and evade law enforcement scrutiny.

**FACTS SUPPORTING PROBABLE CAUSE**

8.     Operation Shamrock Shake is a joint investigation, led by the Federal Bureau of Investigation ("FBI") Violent Crimes Task Force-Gang Group, targeting drug trafficking, violent crime, money laundering, fraud, racketeering, and other organized criminal activities by Aryan Brotherhood (AB) and its subordinate white power street gangs, such as the Supreme Power Skins (SPS), Nazi low Riders (NLR)

1   and Lakeside Gangster operating throughout San Diego County. Other participating

2   agencies include: the California Department of Corrections and Rehabilitation

3   ("CDCR"), San Diego Police Department ("SDPD"), the San Diego Sheriff's

4   Department ("SDSD"), the San Diego County District Attorney's Office ("SDCDA"),

5   the San Diego County Probation Office ("SDPO"), the Bureau of Prisons ("BOP"), the

6   Internal Revenue Service ("IRS"), Homeland Security Investigations (HSI), and the

7   United States Attorney's Office for the Southern District of California ("USAO").

8       9.    The Aryan Brotherhood, also known as the "Brand" or the "AB," initially

9   started out as a protection group for White/Caucasians against other race groups. In the

10  1970's the AB evolved from a group formed solely for protection, to an organization

11  that was involved in the control of narcotic activity, extortion, fraud and murder.

12  Although the AB originated in the California Prison system, it spread to the federal

13  prison system. This occurred when members of the AB entered the federal prison in the

14  early 1970's. Both state and federal factions have distinct membership and leadership;

15  however, both are part of the same organization. According to The California

16  Department of Corrections, the AB currently has an estimated 290 members/associates

17  incarcerated in prison/jail and on the streets throughout the state of California. Although

18  AB membership consists of only .1% of the California prison population, they are

19  responsible for approximately 50% of prison homicides and are known for their ability

20  to control subordinate White/Caucasian gangs outside of prison. The AB collects

21  "taxes" or payments from these gangs to further their criminal enterprise. The AB has

22  a history and reputation for using violence as a means of maintaining power and being

23  a force to be reckoned with as a criminal enterprise.   The AB is involved in drug

24  trafficking, firearms trafficking, extortion, murder, and assaults.

25      10.    The investigation has revealed that Michael TRIPPE, who was released

26  from custody on October 20, 2012, is the only validated member of the California state

27  AB who is out of custody in San Diego County.  According to CDCR, TRIPPE is

28  responsible for the day-to-day functions of the AB within San Diego County.

Investigators have also identified Charles LYNCH, aka "Chucky," a Nazi Low Rider (NLR)[1] member, as the secretary for the AB in the San Diego area since before 2014. A secretary's role is to work on behalf of the leader of the criminal enterprise/gang. He is a highly valued member of the gang and generally has stature, seniority, and trust of the leadership.  One of his main functions is to insulate the figurehead from criminal prosecution by handling communications with subordinates that would implicate him in criminal activity.  His functions may also include acting as an accountant by keeping track of illegal finances and taxes collected, identifying issues with enemy gang members, networking amongst the membership by organizing meetings, and/or issuing orders to commit crimes to maintain control and order of the criminal enterprise.

11.    During this investigation, investigators identified Supreme Power Skins (SPS) as a subordinate white supremacist gang operating under the direction of the Aryan Brotherhood. Agents believe that the Aryan Brotherhood is currently using SPS to further their criminal enterprise through drug trafficking and money laundering. Todd JOHNSON, aka "Coyote," was identified as a significant figure within the SPS. Agents confirmed that JOHNSON is the current shot caller for SPS by reviewing recorded jail phone calls by AB and SPS members in which they discuss JOHNSON and his role within SPS. In addition, agents conducted multiple surveillances of AB and SPS members which confirmed that JOHNSON is a leadership level figure within SPS. JOHNSON is a methamphetamine and opioid distributor and uses the drug distributor role to increase his status in the SPS gang.

12.    Brett WENBOURNE, aka "Split," was identified as a methamphetamine source of supply for JOHNSON. WENBOURNE is a high-ranking member of the Lakeside Gangsters[2] and coordinates the distribution of methamphetamine through his

---

[1]      The Nazi Low Riders (NLR) are a subordinate white supremacist gang operating under the direction of the AB.  Investigators believe that the AB is currently using the NLR to further their criminal enterprise through drug trafficking and money laundering.

[2]      Lakeside Gangsters are a multi-generational criminal street gang whose members participate in a pattern of criminal activity which includes assaults and narcotics trafficking. Lakeside Gangsters also have ties to and support other white supremacist groups such as the Supreme Power Skins and the Aryan Brotherhood.

methamphetamine distributors Lakeside Gangster member Daniel SAMSEL, aka "Kai," and Nicole SAMSEL. WENBOURNE is also involved in violent acts aimed against individuals within the Lakeside community who are believed to be cooperating with law enforcement or went into protective custody or "PC" when incarcerated within county jail or state prison, which is considered a punishable offense against the criminal street gang and Aryan Brotherhood prison gang. In June 2019, WENBOURNE contacted LYNCH to run a check on an individual believed to be in bad standing with the Nazi Low Riders and Aryan Brotherhood.

13.    During the course of the investigation, between June 2019 and September 2019, investigators received court authorization to intercept wire and electronic communications to and from six different cellular telephones. Investigators intercepted communication regarding the distribution of controlled substances, extortion, assault, check fraud, identity theft, and firearms trafficking.

14.    One of the court authorizations was signed on  August 16, 2019 by the Honorable Marilyn L. Huff, United States District Judge for the Southern District of California, issuing an Order authorizing the interception of wire and electronic communications to and from cellular telephone number (619) 214-4141 (hereafter referred to as the "Target Telephone") and used by WENBOURNE. Interception of wire and electronic communications over the Target Telephone began on August 19, 2019 and terminated on September 17, 2019. These interceptions supported the investigation into the Lakeside Gangsters and the criminal activity committed by members associated with the Lakeside Gangsters. This criminal activity involved methamphetamine trafficking, firearms trafficking and possession, and various forms of identity theft and fraud.

15.    Investigators know Aaron ROSE, aka "Rhino," to be an associate of the Lakeside Gangsters. Based upon intercepted communications over the Target Telephone, investigators learned that members and associates of the Lakeside Gangsters contacted ROSE regarding check fraud, identity theft, and other fraud related activity.

16. On July 11, 2019, ROSE was arrested by the San Diego Sheriff Department for possession of a driver's license/identification to commit forgery, forgery, possession of a blank check to commit fraud, writing or passing of check with insufficient funds to defraud, and possession of a controlled substance. ROSE was booked into jail and was later released on bail. During the arrest, deputies found an HP printer, blank check paper, completed blank false checks, a Toshiba laptop, fake CA driver license cards which had ROSE'S driver's license picture on it, an identification card, a credit card, and a driver license which did not belong to ROSE. Based upon the evidence, investigators believe ROSE was involved in creating false checks and identity theft.

17. On August 23, 2019, at approximately 12:21 a.m., WENBOURNE sent an outgoing text message on the Target Telephone to telephone number (619) 895-7348 (ROSE). The text read, "I need to talk biz w you." WENBOURNE sent a follow-up text which read, "What's good g?" ROSE texted, "He has 1 full w and 2 pieces. I'll be there in 20 min." WENBOURNE texted, "K." At approximately 2:52 a.m., WENBOURNE texted ROSE, "Can I grab that from dude or what?" Based upon the series of intercepted text communications, investigators believe ROSE had a drug connection who was in possession of an ounce of methamphetamine (1 full w) and two ounces of heroin (2 pieces) and was offering the drugs to WENBOURNE for purchase.

18. On August 23, 2019, at approximately 10:13 p.m., WENBOURNE placed an outgoing telephone call on the Target Telephone to William KELLY at (619) 451-9724. WENBOURNE stated, "Just passed out at the Motel Six in El Cajon." KELLY asked, "Can you bring me a dub?" WENBOURNE replied, "Meet you outside." Based upon this intercepted telephone call, investigators believe WENBOURNE was going to distribute $20 of drugs to KELLY. KELLY is an associate of the Lakeside Gangsters.

19. On August 24, 2019, at approximately 11:55 a.m., WENBOURNE received an incoming telephone call on the Target Telephone from ROSE at telephone number (619) 895-7348. WENBOUNRE stated, "I'm driving to your house…That dude

had a PC (Protective Custody) there again…Trips…That PC was there when I got there." ROSE asked, "Is he still there?" WENBOURNE replied, "Nah. He walked out as soon as I got there." Based upon this intercepted communication, investigators believe ROSE and WENBOURNE were talking about assaulting a person who went into protective custody while incarcerated in jail/prison. Going into protective custody or PC is a violation of gang code of conduct.

20.     On September 4, 2019 investigators observed Justine GEORGE, ROSE, and Markie VALDEZ depart ROSE's residence at Oro Street in GEORGE's white Jeep. Investigators followed the Jeep to the Smart and Final in El Cajon. GEORGE and VALDEZ exited the vehicle and walked into the store. GEORGE and VALDEZ attempted to purchase groceries valued at $301.00 with a check and temporary DMV paperwork as a form of identity.  The cashier did not allow the transaction to process due to possible fraud. GEORGE and VALDEZ departed the store, entered the Jeep, and drove to ROSE's residence. At approximately 5:29 p.m., GEORGE and VALDEZ returned to the Smart and Final and purchased $369.57 worth of groceries using a check from the account of Rande Turner. Investigators contacted Turner and he verified he had been a victim of an unreported theft and had not given anyone permission to use his checks.

21.     On September 6, 2019, Turner filed a police report with the San Diego County Sheriff's Department. Turner was the victim of a vehicle burglary which occurred between September 1, 2019 and September 3, 2019. Turner's vehicle was burglarized in Del Mar, and four checkbooks were among the property stolen.  Two checkbooks were issued by Union Bank of California, and two checkbooks were issued by First Republic Bank.  The checkbooks belonged to Turner, and he did not give GEORGE, VALDEZ, ROSE, or anyone else permission to use them.

22.     On September 6, 2019, at approximately 10:39 a.m., WENBOURNE received an incoming text message on the Target Telephone from ROSE using telephone number, (619) 895-7348. The text message read, "…I need a printer bad

homie." WENBOURNE texted, "What kind where do u get it and wi[n]dow break we go." ROSE texted, "Any kind of printer bro it doesn't matter what kind as long as it works and...Has ink." WENBOURNE replied "K." Based upon this electronic communication interception, investigators believe ROSE reached out to WENBOURNE to have WENBOURNE obtain a printer. Investigators believe WENBOURNE's response regarding breaking windows referred to his intent to obtain the printer by committing a burglary.

23.    On September 7, 2019, at approximately 11:48 a.m., the Target Telephone received an incoming telephone call from Markie VALDEZ using Telephone number (619) 456-7296. WENBOURNE'S girlfriend, Justine GEORGE, answered the phone. VALDEZ told GEORGE to get at Aaron, then stated "Rhino." VALDEZ continued, "Remember the checks I ran the other day or whatever?" GEORGE replied, "Yeah." VALDEZ stated, "Those were from the actual people's check account …check book." VALDEZ stated, "The ones I did, he (Rhino) never told me that. The ones he gave me didn't run, none of them at all…if you go into Union Bank and try to use anything with that account that's the moment it fucks everything off." VALDEZ stated she told him (Rhino) last night. Investigators believe GEORGE and VALDEZ obtained checks from ROSE and attempted to cash the checks.

24.    On September 8, 2019, at approximately 6:20 p.m., WENBOURNE received an incoming telephone call on the Target Telephone from ROSE at telephone number (619) 895-7348. ROSE stated, "Something may have happened to JJ because he's not answering his phone." WENBOURNE replied, "He (JJ) might be in jail…I don't deal with him because he's SDSH (San Diego Skin Heads) and almost damn near in the hat (to be assaulted or killed by the AB). Nazi Low Riders and Skinheads are enemies. Why do you hang with JJ?" ROSE responded, "I'm looking for someone with a valid ID and social security number and has never written a bad check at the casino." WENBOURNE replied, "Not interested…They are not busting (arresting) people now doesn't mean they won't indict everyone in five years…Don't want it in my name."

25.   On September 25, 2019, at approximately 9:58 a.m., investigators observed ROSE exit a hotel room located at the Sure Way Inn at 1355 E. Main Street, El Cajon.  ROSE exited Room 321 on the top floor of the hotel.  ROSE entered a Ford Explorer bearing California License Plate 3UQB441.  Investigators followed ROSE away from the Sure Way Inn and conducted a traffic stop on the vehicle pursuant to an active felony arrest warrant for ROSE, who was taken into custody for the felony arrest warrant without incident.  During a search incident to arrest, ROSE was found to be in possession of several California Driver Licenses and a Social Security Card.  All the cards appeared to be falsified; however, they were high quality reproductions of DMV issued cards.  A wallet found in ROSE'S rear left pants pocket contained four California Driver Licenses (CDL).  One CDL appeared to be issued by the DMV and had Aaron ROSE'S true information on it.  Two CDLs had the name Rande Turner on them with two different driver license numbers, C7103489 and J7558015, with a date of birth of 8/13/71 and ROSE's photo. None of this information matched the true information of Aaron ROSE or Rande Turner. There was also a California Driver License with ROSE'S photo and the name Wayne Howard Brant with a date of birth of 5/30/70.  This also did not match ROSE'S true identity.  ROSE was in possession of three credit cards with his name printed on them. ROSE also had a Sure Stay card holder in his pocket along with two hotel room key cards.  The numbers "321" were written on the front of the card holder with the key cards.  **Target Device 6** was seized from ROSE's person.

26.   After the traffic stop of ROSE, investigators returned to the Sure Way Inn and spoke to the Sure Way Inn's General Manager. The manager indicated Rooms 320 and 321 were being paid for by a male (ROSE) who identified himself as Rande Turner.

27.   While a search warrant for Room 321 was being completed, investigators continued surveillance on Rooms 320 and 321 of the Sure Stay Inn. Investigators observed Kiyah Neff and Matthew Ebert leave Room 320 with another unknown male, later identified as Elliott Sims, who was also determined to have an active felony warrant.  Neff and Ebert were both known to have active felony warrants and had prior

criminal history pertaining to identity theft. Neff, Ebert, and Sims got into a Silver Lexus and departed from the Sure Stay Inn.  A traffic stop was conducted on the Lexus and Neff, Ebert, and Sims were arrested based upon their outstanding felony arrest warrants.    During  the  search  of  the  Lexus,  investigators  discovered  personal identification information, checks not belonging to Neff, Ebert nor Sims, and small amounts of narcotics located inside the Lexus.

28.    Investigators executed a state search warrant (E2019-814) authorizing the search of Room 321 at the Sure Way Inn on 1355 E. Main Street, El Cajon and located an identity theft lab.  During the search, investigators seized a large HP Laser Jet Printer; a HP Desk Jet Printer;  an Apple iPad **(Target Device 1)**; a Samsung Tablet in a floral case; a Samsung Tablet **(Target Device 2)**; a Dell Laptop **(Target Device 3)**; two HP Laptops **(Target Device 4 and Target Device 5)**; a VISA Fusion credit card scanner; a  glass  pipe  used  to  smoke  methamphetamine  with  suspected  methamphetamine residue; a backpack containing personal identifying items, a slim jim; a non-working stun gun; $956 in counterfeit currency (9 $100, 2 $20, 1 $10, 1 $5, and 7 $1); vehicle registration  for  WENBOURNE;  blank  Wells  Fargo  checks  under  various  people's names; a stolen CDL and Navy Federal Visa; money orders; a fraudulent Bank of America check for $450.32 dated August 9, 2019; numerous identification cards, checks; blank checks; and numerous pages of hand written personal information.

29.    Post *Miranda*, ROSE denied possession of any items found in the hotel room. ROSE admitted he had been staying in the room for a few days. ROSE denied any affiliation with any members of the San Diego Skin Heads. When confronted about the victims of identity theft and some not having the ability to recover the money stolen from them, ROSE replied, "It all gets recouped…Check doesn't affect credit at all…I don't fuck with credit cards…I don't do anything that hurts anybody." ROSE claimed that making false identity documents was a hobby.  ROSE stated, "My little hobby that I have about you know, making ID's and stuff… Yeah, I'll admit, I'll make ID's once in  a  while…There's  nothing  illegal  about  that." ROSE maintained that fraudulent

checks do not affect his victim's credit and investigators did not understand what ROSE does.

30.     Investigators have identified nineteen (19) victims of identity theft/check fraud involving evidence seized from the abovementioned search warrant.   The circumstances from which each victim's identity was stolen ranged from vehicle burglaries to commercial burglaries to a purse theft from a local mall.  Investigators are still in the investigation phase of this case, and I estimate more victims will be located based on the raw personal information seized and numerous victims related to the electronics on this warrant.

## METHODOLOGY FOR CELLULAR TELEPHONES

31.     It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.  Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect

1   the device manually and record the process and the results using digital photography.

2   This process is time and labor intensive and may take weeks or longer.

3       32.     Following the issuance of this warrant, I will collect each Target Device

4   and subject it to analysis. All forensic analysis of the data contained within the telephone

5   and its memory cards will employ search protocols directed exclusively to the

6   identification and extraction of data within the scope of this warrant.

7       33.     Based on the foregoing, identifying and extracting data subject to seizure

8   pursuant to this warrant may require a range of data analysis techniques, including

9   manual review, and, consequently, may take weeks or months. The personnel

10   conducting the identification and extraction of data will complete the analysis within

11   **ninety (90) days** of the date the warrant is signed, absent further application to this

12   court.

13   **PROCEDURES FOR ELECTRONICALLY STORED INFORMATION (COM**

14       34.     With the approval of the Court in signing this warrant, agents executing

15   this search warrant will employ the following procedures regarding computers and other

16   electronic storage devices, including electronic storage media, that may contain data

17   subject to seizure pursuant to this warrant:

18            **Forensic Imaging for Computers**

19       a.     After securing the premises, or if sufficient information is available

20   pre-search to make the decision, the executing agents will determine the feasibility of

21   obtaining forensic images of electronic storage devices while onsite.  A forensic image

22   is an exact physical copy of the hard drive or other media.  A forensic image captures

23   all the data on the hard drive or other media without the data being viewed and without

24   changing the data.  Absent unusual circumstances, it is essential that a forensic image

25   be obtained prior to conducting any search of the data for information subject to seizure

26   pursuant to this warrant.  The feasibility decision will be based upon the number of

27   devices, the nature of the devices, the volume of data to be imaged, the need for and

28   availability of computer forensics specialists, the availability of the imaging tools

required to suit the number and nature of devices found, and the security of the search team. The preference is to image onsite if it can be done in a reasonable amount of time and without jeopardizing the integrity of the data and the agents' safety. The number and type of computers and other devices and the number, type, and size of hard drives are of critical importance. It can take several hours to image a single hard drive - the bigger the drive, the longer it takes. As additional devices and hard drives are added, the length of time that the agents must remain onsite can become dangerous and impractical.

b.      If it is not feasible to image the data on-site, computers and other electronic storage devices, including any necessary peripheral devices, will be transported offsite for imaging. After verified images have been obtained, the owner of the devices will be notified and the original devices returned (to the state) within forty-five (45) days of seizure absent further application to this court.

### Identification and Extraction of Relevant Data

c.      After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant. Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment and software. There are thousands of different hardware items and software programs, and different versions of the same programs, that can be commercially purchased, installed, and custom-configured on a user's computer system. Computers are easily customized by their users. Even apparently identical computers in an office or home environment can be different with respect to configuration, including permissions and access rights, passwords, data storage, and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

d.      Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which

must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant hit does not end the review process for several reasons.  The computer may have stored metadata and other information about a relevant electronic record – e.g., who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted.  Keyword searches may also fail to discover relevant electronic records, depending on how the records were created, stored, or used.  For example, keywords search text, but many common electronic mail, database, and spreadsheet applications do not store data as searchable text.  Instead, the data is saved in a proprietary non-text format.  Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image.  Graphic images, unlike text, are not subject to keyword searches.  Similarly, faxes sent to the computer are stored as graphic images and not as text.  In addition, a particular relevant piece of data does not exist in a vacuum.  To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data.  Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

e. It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users that generally is not visible to users.  Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history,

cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time.  In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time.  The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user.  For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

f.      Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling.  For example, a single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent to 500,000 double-spaced pages of text.  Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data.  And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer).  The sheer volume of data also has extended the time that it takes to analyze data.  Running keyword searches takes longer and results in more hits that must be individually examined for relevance.  And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

g.      Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including  hashing tools to identify data subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files.  The identification and extraction process, accordingly, may take weeks or months.

The personnel conducting the identification and extraction of data will complete the analysis within **one-hundred twenty (120) days** of this warrant, absent further application to this court.

h.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

35.     On October 11, 2019, an investigator with the San Diego County Sheriff's Department obtained state search warrants to conduct a forensic examination/search of the **Target Devices** for evidence limited to ID theft, check fraud, and possession of counterfeit currency. The scope of this requested warrant is significantly wider. On November 21, 2019, a forensic search was completed on **Target Device 3**. On November 24, 2019 a forensic search was completed on **Target Device 2**, **Target Device 4**, and **Target Device 5**. Investigators wish to conduct a search of the forensic extractions completed on November 21, 2019 and November 24, 2019 of the abovementioned **Target Devices.** A previous attempt to conduct a forensic search of **Target Device 1** and **Target Device 6** on November 24, 2019 was unsuccessful, but due to recent enhancements to law enforcement's ability to conduct forensic searches and extractions of electronic devices, investigators wish to make another attempt.

## CONCLUSION

36.     Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the Target Devices will yield evidence of violations of the Target Offenses. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachment A-1 through A-6 and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____

**_Special Agent Peter Pisciotta_**
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this **18 th** day of March, 2021.

_____
Honorable Linda Lopez
United States Magistrate Judge